JAMES F. McMAHON, by his next friend, JAMES McMAHON, *vs.* ANSON M. BANGS.

*Case—Personal Injuries—Evidence—Expectation of Life—Earning Capacity—Notice to Employee of Dangerous Character of Employment—Record of Hospital to Show the Condition of Patient—Nonsuit—Fellow-Servant.*

1. In a suit for damages for personal injuries which did not result in total disability, the plaintiff is permitted to show the expectation of life of a person of the age of the plaintiff.

2. In such a suit by a minor, by next friend, the plaintiff is permitted to show his earning capacity at the time of the accident, notwithstanding the father has then brought an action to recover for the loss of the services of his son during his minority.

3. Under the evidence adduced, held by the Court that evidence offered to show that no notice was given to the plaintiff of the character of danger connected with his employment was not admissible.

4. The record of a hospital, regularly kept by one of the nurses who was no longer employed there, was offered to show pain and suffering on the part of the patient, the plaintiff in action; held that such record was not admissible.

5. A witness offered by the plaintiff as an expert in blasting operations, held not to be qualified to speak as an expert in the case, his experience not having been in such blasting as is involved in the case on trial.

6. Upon the evidence presented by the plaintiff, held that as between the plaintiff and defendant, at the time of the accident, the relation of master and servant existed; also, that as between the plaintiff and the person whose negligence it is alleged caused the injury complained of, there existed the relation of fellow-servants. A nonsuit was therefore granted.

(*May 31, 1904.*)

JUDGES GRUBB, PENNEWILL and BOYCE, sitting.

*J. Harvey Whiteman* for plaintiff.

*Harry Emmons* for defendant.

Superior Court, New Castle County, May Term, 1904.

ACTION ON THE CASE (No. 104, May Term, 1903), to recover for injuries alleged to have been received by the plaintiff, a fifteen-year-old boy, by being struck upon the leg by a rock hurled from a blast in the stone quarry operated by defendant in Brandywine Hundred near Bellevue, while plaintiff was driving his brother's horse and cart which were being used in the service of the defendant company, in connection with said quarry.

At the trial, plaintiff testified in part, as follows :

That on the day of the accident, December 20, 1902, he was engaged in hauling dirt for the defendant with the horse and cart of his brother, William J. McMahon ; that he drove the horse, and that certain employees of the defendant did the " stripping" (which witness explained was clearing off the soil from the top of the rocks), and loaded the dirt in the cart; that he was employed and paid by his brother for driving the horse and cart and that his brother had the right to discharge him. The witness then testified concerning the accident as follows:

*By Mr. Whiteman :*
　　Q.　What, if anything, happened to you on the 20th day of December, 1902 ?　Did you meet with any accident ?　A. I got my leg broke.
　　Q.　How ?　A. By a stone hurled from a blast.
　　Q.　Where did the blast take place ?　A. Down in the quarry of Hughes Brothers and Bangs.
　　Q.　Where were you working?　A. Up on top of the bank.
　　Q.　How near the edge of the quarry ?　A. About four feet.
　　Q.　What were you doing at the time you were struck?　A. Sitting on my cart.
　　Q.　Was the cart being loaded or not?　A. Yes, sir; I had just got backed in and they started to load the cart and I was struck.
　　Q.　Where were you struck ?　A. On the right leg.
　　Q.　What struck you ?　A. A stone.

EVIDENCE.

Q.  What became of you after that ?   A.  I was knocked unconscious.

Q.  Was there any warning of any kind given to you  or  the other men about there at the time this blast was fired ?   A.  No, sir ; there was not.

Q.  What was  the  first  thing you knew about a blast being fired?   A.  There was always warning given about  five  or  six minutes  ahead  of  the  blast, in  order  to give us time to get away from the bank.

Q.  What did you do when  warning  was  given  as  a  rule ? A.  Took  the carts away, either down to the dump, or got away off from there.

Q.  Was that done this day?   A.  No, sir ; it was not.

Q.  What was the first thing you knew on this particular day about a blast being fired ?   A.  The first thing I knew after I was struck ?

Q.  Yes ?   A.  When I was  being carried out of the quarry store.

Q.  Did you know anything at all about the blast until after you were struck?   A.  No, sir ; I did not.

Q.  Did anybody who was at work there where these carts were  engaged  in  stripping  leave  the  place just prior to the blast being fired?   A.  No, sir ; they did not.

Q.  Did they all stay there and keep on with their work ? A.  Yes, sir ; kept on with their work ; men who were laboring and all.

CROSS EXAMINATION.

*By Mr. Emmons :*

X.  How  long  had  you  been  employed  at the quarry ?   A. From  the  twenty-ninth of October to the twentieth of December, 1902, the day I was struck.

X.  That  would  be  about  two months or eight weeks ?   A. Yes, sir.

X.  How long had you known that quarry?   A.  I heard tell of it for nine years.

X. You say that your brother employed you? A. Yes, sir; he did.

X. And you say that your brother had the right to discharge you? A. Yes, sir.

X. Did your brother tell you what to do? A. The boss up there on the hill told me what work to do when I went up there.

X. Had your brother anything whatever to do with the work up on top of the hill? A. No, sir; he had not.

X. Had your brother ever gone there with you? A. No, sir.

X. Did he ever give you any directions? A. He told me to be careful.

X. Therefore you were under the direction of the boss of the gang? A. Yes, sir; I was hauling the dirt.

X. Did he not tell you where to back your cart? A. Yes, sir.

X. Did he not tell you where to go with it? A. Yes, sir.

X. If you did not obey him what would happen? A. I think I would get laid off.

X. Then did not that boss have the right to lay you off? A. Well, he had the right to send me away from the quarry.

X. He had the right to discharge you, did he not? A. From the quarry, he did.

X. And your brother also had the right to discharge you if he wanted to, and so did the quarry man there, the boss? A. Yes, sir.

X. So that you were working under the directions of the boss of the gang? A. Yes, sir.

X. And did just what he told you to do? A. Yes, sir.

X. And if you did not do what he told you to do, he was likely to " fire " you? A. Yes, sir.

X. You say you had been there about eight weeks? A. Yes, sir.

X. About how many blasts a day were fired off there at that quarry? A. Well, sometimes there was ten or twelve maybe, if

they were short of small stone or anything; sometimes it was not very many.

X. Were not there one hundred sometimes? A. There might have been.

X. It is a large quarry, is it not? A. Yes, sir.

X. You also said in your testimony that somebody usually gave notice? A. They always did until this day.

X. Who gave the notice? A. The men down in the quarry.

X. What men? A. The Italians; sometimes the walking boss in there.

X. Do you know what man it was down there that gave notice? A. No, sir; I did not know his name.

X. Was not there a man down there whose duty it was to give notice? A. I don't know whether he was there or not.

X. Was not there a man down there whose duty it was to give notice? A. The walking boss would; yes, sir.

X. Was not there a man down in the quarry whose duty it was to give notice or warning before the blasts were fired? A. Yes, sir; I think there was.

X. And you had been there eight weeks? A. Yes, sir.

X. And during all of those eight weeks there was somebody down in the quarry whose duty it was to give notice and who gave notice? A. Yes, sir.

X. And you had always had an ample opportunity to get out of the way until this day? A. Yes, sir.

X. Is that so? A. Yes, sir.

X. You say you know there was somebody down there whose duty it was to give notice. Was not that one of the men working down there? A. Yes, sir; I think it was.

X. Was not the man employed by Hughes Brothers and Bangs; just the same as the other men? A. Yes, sir.

X. And he was employed there, was he not; for the purpose of giving notice? A. So far as I know. I did not know his name; did not know much about it.

X. Was not this the only day while you were there that they failed to do it? A. Yes, sir.

X. Leaving out the question of the blasting, was there any danger there—was it a safe place? A. It was all right only the backing over.

X. It was all right in other respects. Then you would have been perfectly safe there if that blast had not gone off, would you not? A. Yes, sir.

X. And you would always have been safe there if you had had sufficient warning? A. Yes, sir.

X. You could have gotten out of the way? A. Yes, sir.

## RE-DIRECT EXAMINATION.

*By Mr. Whiteman:*

R. Q. When you spoke of being subject to the orders of the boss, do you mean that when he would tell you to go and haul dirt to a certain place, you would have to go and haul it to that place? A. Yes, sir.

R. Q. And if you did not do it he could send you and your cart away? A. Yes, sir.

R. Q. That boss had nothing to do with employing you? A. No, sir; he did not. My brother did that.

*Ralph Dale*, a witness being produced, sworn and examined, on the part and behalf of the plaintiff, testifies upon cross-examination as follows:

*By Mr. Emmons:*

X. Could not there have been a warning given without your hearing it? A. I was right there, and the boss was right over the top of me and I could hear it as well as anybody else.

X. What boss? A. The boss we had there, the boss of the gang that told us what to do.

X. ˙ Who was that? A. I don't know; he was an Italian.

X. Was he not employed by the quarry people? A. He was employed by the quarry people.

X. And he was your boss, was he not? A. Yes, sir.

X. He told you where to put the horses and carts? A. Yes, sir.

X. And he told you where to take the dirt, did he not? A. Yes, sir.

X. Was it he who gave you warning? A. He did not give us any warning.

X. Did he give you warning sometimes? A. Yes, sir; he always did.

X. That man always gave warning, did he? A. Yes, sir; only when we were on the other side.

X. I mean did not not somebody down below give warning? A. No, sir; not that I recollect.

X. I mean at other times, did not somebody down where the blast was going off give warning? A. Yes, sir; they hollered "Fire."

X. And that was one of the men working there. A. Yes, sir.

X. Working for the firm of Hughes Brothers & Bangs? A. Yes, sir.

X. It was that man's duty, was it not, to give warning? A. I don't know who it was.

X. Was there a man there whose duty it was to give warning? A. Yes, sir.

X. And he always did do it until this day—is that right? A. Yes, sir.

X. And on this day he did not do it? A. No, sir.

X. Because the man down there did not say "Fire," it became unsafe? A. Yes, sir.

X. Because he did not say "Fire" and give you a chance? A. Yes, sir.

X. He would generally do that, and then your boss told you to get back? A. Yes, sir.

X.   That was how the thing was done ?   A. Yes, sir.

X.   That was the custom, was it ?   A. Yes, sir.

### RE-DIRECT EXAMINATION.

*By Mr. Whiteman :*

R. Q.   You say it was the duty of this boss to give you warning when somebody below would holler to him ?   A. Yes, sir.

R. Q.   And the man there had the same duty that this boss in charge had to give them notice ?   A. Yes, sir.

R. Q.   And he did not give any such notice that day ?   A. No, sir; sometimes if we heard them down below we would go then.

R. Q.   But this boss was up on the surface with you, was he not ?   A. Yes, sir.

R. Q.   And the people below would call to him and then he would tell the rest of you ?   A. Yes, sir.

R. Q.   That was a general custom, but that was not done on this day ?   A. No, sir.

R. Q.   Or at the time that McMahon was injured ?   A. No, sir.

R. Q.   He did not do that ?   A. No, sir ; the boss generally always stood on the end of the quarry, and he could hear.

R. Q.   You mean the edge right over where they were blasting ?   A. Yes, sir.

R. Q.   He generally stood there so that he could hear down below and tell the rest of you ?   A. Yes, sir.

R. Q.   But that was not done at this time ?   A. No, sir.

(*Charles A. Whalen, Isaac Showell and George Johnson,* all drivers, testified concerning the accident to the same effect, as did the plaintiff.)

*William J. McMahon,* a witness, being produced, sworn and examined on the part and behalf of the plaintiff, testified as follows :

*By Mr. Whiteman :*

Q. Did you ever have any business dealings with the defendant firm ? A. I did, at different times.

Q. What was it ? A. I hired them horses and teams—horses and carts for the purpose of hauling dirt.

Q. What was your contract with them ? A. My contract with them was that they paid me so much a day for the team.

Q. What did that include ? A. That included a driver.

Q. A horse, cart and driver ? A. Yes, sir ; I got $2.50 for a horse, cart and driver. If I did not furnish the driver I did not get that much, and the price of the driver was taken out, $1.35 a day.

Q. Did you ever furnish drivers to go with your horses and carts ? A. I generally did. It was very seldom that they went without drivers.

Q. Did you ever employ and put in charge of one of those horses and carts, your brother, James F. McMahon ? A. I did ; about the 29th of October, I think it was ; somewhere in that neighborhood.

Q. How long did he continue in that capacity ? A. Until the 20th of December, when he was hurt there at the quarry.

Q. Where was the horse and cart with this boy in charge working at the time—for whom ? A. For Hughes Brothers & Bangs.

Q. For that firm ? A. That firm.

Q. When was he hurt ? A. He was hurt on the afternoon of the 20th of December shortly after they went to work. I don't know the exact time. I judge about half past one, the time I found it out.

Q. What control or authority had that firm of Hughes Brothers and Bangs, or the defendant Anson M. Bangs, over your brother, James F. McMahon ? A. They had no control whatever over him at all. The only control they had was over the cart. They had no control over the driver at all. The only thing they

could do if he was not satisfactory, was to send the cart away. They could not discharge him.

Q. If the horse and cart with this driver was not doing the work satisfactorily to them they could dismiss the horse and cart? A. Yes, sir.

Q. And with it went the driver? A. Yes, sir; that is right.

Q. This horse and cart were assigned to do whatever work that somebody about the quarry would designate to be done. A. Yes, sir.

\*  \*  \*  \*  \*  \*  \*

*By Mr. Emmons:*

X. Is it true that the boy worked for Hughes Brothers and Bangs, or not? A. He drove a cart for me. He was employed by me under my directions. Hughes Brothers and Bangs had no jurisdiction over him whatever.

X. What had you to do with the boy when the cart was being loaded—you were not there to direct him and tell him what to do? A. Very seldom.

X. Were you ever there? A. I have been there; yes sir.

X. Did you ever tell him what to do when he was on the cart and it was being loaded? A. I have once or twice told him to pull out, that he had a load on.

X. So far as the boy had to do with the stripping of the quarry was not he subject altogether to the directions of that boss? A. Well, I would judge in a certain sense he was.

X. That boy could not do as he pleased there, could he? A. Oh, no.

X. And that boy was not subject to your orders there, was he, to do just what you told him? A. No, sir; he was in charge of my cart.

X. And who had the control of the cart? A. I had the control of the cart.

X. When? A. As long as I owned it.

X. Did you control the cart when it was on top of the hill being loaded with dirt? A. Certainly; I could take it away from there any time I saw fit.

X. Did you have any general direction of the cart when they were taking dirt away from there? A. Taking it where?

X. Taking the dirt to dump it? A. No, sir.

X. Who did that? A. One of the men there, known as gang boss, I believe.

X. Was not that gang boss employed by Hughes Brothers and Bangs? A. I believe he was, so far as my knowledge goes.

Plaintiff called *W. W. Knox*, a life insurance agent, and asked him to consult his table of the expectancy of life and tell the Court and the jury the probable expectation of life of a perfectly healthy boy whose nearest birthday is fifteen.

(Objected to by defendant's counsel on the ground that the evidence showed that the plaintiff was not so injured as to interfere with his earning capacity.)

BOYCE, J.:—We overrule the objection and admit the testimony.

A. The expectation of life of a person fifteen years of age is 45 50-100.

*James F. McMahon* was recalled and asked:

Q. What wages were you paid as driver?

(Any proof of earning capacity was objected to by counsel for defendant as immaterial, because a suit by the father of the boy was pending seeking to recover wages for the boy until 21 years of age. Plaintiff's counsel contended he was entitled to prove that the plaintiff was in such condition up to the time of the accident that he could earn money.)

BOYCE, J.:—We overrule the objection and admit the testimony.

A.   Seventy-five cents a day.

Q.   When you went there with your horse and cart as its driver were you notified by Mr. Bangs or anyone in his employ of the character of danger connected with that employment?

(Objected to by counsel for defendant *first*, because the witness had been employed at the quarry for eight weeks and knew the danger; *second*, he was an employee and assumed the usual risks of his employment.)

BOYCE, J.:—We hardly think that this question is admissible under the evidence adduced in this case.

*Alida Turner*, head nurse of the Homeopathic Hospital in Wilmington, was produced by plaintiff, and after testifying as to the condition of the plaintiff when brought to the hospital, was questioned concerning a certain record of the case which she testified was regularly kept by one of the nurses of said hospital, who had since been dismissed and was not present in Court. Said record was thereupon offered in evidence and was objected to by counsel for defendant on the ground that the only person who could testify to said record so as to make it proper evidence would be the person who made it.

BOYCE, J.:—It seems to the Court that the object of offering this paper in evidence is to show pain and suffering. For that purpose the nurses themselves might be called, and under proper circumstances this paper could be used to refresh their memories; beyond that we think it is not admissible.

*Arthur Sullivan*, being produced as a witness on behalf of plaintiff, was examined as follows:

*By Mr. Whiteman:*

Q.   Have you ever had any experience in charge of blasting operations?   A.   Yes, sir.

Q. What was that experience; how many years? A. Three and a half years.

Q. What was it? A. Loading holes with dynamite and putting a fuse off with a battery.

Q. Where were you blasting? A. All about different parts of the City of Wilmington.

Q. In connection with what work or department? A. The Street and Sewer Department, for which I am foreman.

Q. Do you know the kind of blasting that was done at the Bellevue quarry? A. Well, I have never seen it done in the quarry, but I have an idea about it.

Q. Is that the same kind of blasting as you did here so far as boring holes and putting in blasts is concerned? A. I believe it is.

Q. I will ask you if you know of any method that can be employed to protect persons nearby when blasting is being carried on, from injury by flying fragments of rock?

(Mr. Emmons objects to the above question, and pending the ruling of the Court upon the objection, in cross-examination draws out from the witness the fact that the witness had had no experience with stone quarries, and that while he had set off blasts while working for the Street and Sewer Department in the City of Wilmington, he did not know how much powder or dynamite was used as a charge in the Bellevue quarry, or whether it was a greater or less amount than was used in the City work which he had been engaged in doing; or what precautions were taken in quarry blasting or whether it was necessary or feasible in the Bellevue quarry to cover their blasts. Mr. Emmons then stated that he objected to the question upon two grounds: (1) that under the testimony adduced there was no duty resting upon the defendant to cover the blasts; (2), that the witness was not qualified to speak as an expert upon the subject of what precautions were employed to protect persons near blasting operations in a quarry.)

*Whiteman,* for plaintiff, contended that the method of blasting or protecting the public was the same whether the blasting was done in a city or in a quarry in the country, therefore that the witness was qualified to speak as an expert.

BOYCE, J. :—We think the witness is not qualified to speak as an expert in this case.

(The plaintiff rested, and Emmons for defendant moved for a nonsuit on the ground that the proof established the relation of master and servant between the defendant and the plaintiff; that the employee who failed to give warning of the blast, whereby the plaintiff was injured, was a fellow-servant with the plaintiff, and that the failure of a fellow-servant to perform his duty could not be charged to the master ; that the plaintiff, being a servant of the defendant assumed all the ordinary risks of his employment, among which was the danger arising from the fact that the blast had not been covered.

Said motion was argued at length by the respective counsel and numerous authorities were cited.)

BOYCE, J. :—We have carefully as we could, in the limited time afforded, examined the authorities of counsel, and we have also examined all of the testimony of the witnesses in this case ; and we have reached the conclusion that as between the plaintiff and the defendant at the time of the accident the relation of master and servant existed. We have further concluded that as between the plaintiff and the person whose negligence it is alleged caused the injury complained of there existed the relation of fellow-servants, and because of such relation the motion for a nonsuit is granted ; there being no liability on the part of the defendant.

(The plaintiff declining to take a nonsuit, upon request of counsel for defendant the Court gave binding instructions to the jury as follows) :

BOYCE, J., charging the jury :

Gentlemen of the jury:—We instruct you to find a verdict for the defendant.

Verdict for the defendant.